UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANDRE MOORE,                                          :

                  Petitioner,           :          **<u>MEMORANDUM DECISION</u>**

          - v -                         :          21-CV-3039 (DC)

JAY JOHNSON,                                           :

                Respondent.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:                    ANDRE MOORE
                                Petitioner *Pro Se*
                                14-A-0466
                                Green Haven Correctional Facility
                                PO Box 4000
                                Stormville, NY 12582

                                ERIC GONZALEZ, Esq.
                                District Attorney, Kings County
                                By:   Leonard Joblove, Esq.
                                      Julian Joiris, Esq.
                                      Assistant District Attorneys
                                350 Jay Street
                                Brooklyn, New York 11201
                                      Attorney for Respondent

CHIN, Circuit Judge:

        On December 6, 2013, following a jury trial, Petitioner Andre Moore was

convicted in the Supreme Court of the State of New York, Kings County (DelGiudice,

*J.*), of second-degree murder, second-degree criminal possession of a weapon, second-

degree attempted murder, second-degree assault, and second-degree robbery. The Appellate Division, Second Department, affirmed his conviction and modified his sentence, *People v. Moore,* 83 N.Y.S.3d 682 (2d Dep't 2018) ("*Moore I*"), and the New York Court of Appeals denied his application for leave to appeal, *People v. Moore,* 115 N.E.3d 637 (N.Y. 2018) (Fahey, J.) ("*Moore II*").

On May 24, 2021, Moore filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). Dkt. 1. Respondent Jay Johnson, represented by the King's County District Attorney's Office, filed his opposition to the Petition on August 10, 2021. Dkt. 5.

On March 15, 2024, the case was reassigned to the undersigned.

For the reasons that follow, the Petition is DENIED.

## STATEMENT OF THE CASE

### A.   *The Facts*[1]

The evidence at trial established the following:

Moore and his codefendant, Sahiah Davis, were part of the Wave Gang, a gang in Brownsville, Brooklyn, whose rivals were the Hoodstarz gang, another gang in the neighborhood. Dkt. 5 at 1-2; Dkt. 6 at 829.

---

[1] The facts are drawn from the People's brief on the direct appeal to the Appellate Division, which was filed in this Court as part of Respondent's opposition to the Petition. The recitation of facts set forth in the state appellate brief are supported by detailed citations to the record. *See* Dkt. 6 at 1715-38.

2

1.    *The November 2010 Shooting*

On November 12, 2010, at approximately 8:45 p.m., Moore and his three friends got into an altercation with Billy Pitt and Pitt's three friends outside 414 Sutter Avenue over a previous "beef" the two had. Dkt. 6 at 947-48. After the groups argued for a bit, Moore's group left. *Id.* at 949. Shortly thereafter, Moore returned, pulled out a gun, ran towards Pitt, and fired multiple shots at Pitt from several feet away. *Id.* at 949-50. Pitt ran from the area and was not hit. *Id.*

At the same time, Deborah Crowder was coming from her sister's house to her home at 362 Sutter Avenue. *Id.* at 472. She was walking from the train when she heard gunshots. *Id.* "[A] bunch of boys" ran in her direction, and "people ducked down." *Id.* at 474. Crowder began to cross the street to get out of the way, and then "felt a shot of pain" in her right calf and saw blood coming through her jeans. *Id.* at 475. Her leg began to get numb. *Id.* at 476. Two police officers approached, and she told them she had been shot in the leg. *Id.* An ambulance took her to the hospital. *Id.* By the time the ambulance arrived, her leg felt "really numb." *Id.* at 477. She had two wounds: one in the front and one in the back of her leg. *Id.* Crowder was in pain and used crutches for several weeks after the shooting. *Id.* at 478.

Detective David Centeno and Police Officer Edward Foglia responded to the shooting. *Id.* at 519-20. Officer Foglia found two nine-millimeter shell casings on the ground, which were brought to the lab for analysis. *Id.* at 496. Detective James

3

Valente, an expert in firearms analysis, determined that both casings Foglia recovered were fired from the same weapon. *Id.* at 752. Security cameras also captured the shooting in part and showed multiple people standing in the courtyard and then running toward the street. *Id.* at 981.

Thereafter, Detective Centeno interviewed Pitt and Crowder. *Id.* at 522, 525. Centeno later arrested Moore in connection with the shooting. *Id.* at 525-26.

### 2. *The July 2011 Murder*

Around 3:45 a.m. on July 23, 2011, Michael Lowden, Marlon Riley, and two women were walking along the north side of Pitkin Avenue and saw Moore with a group of others -- including Devon Britt -- on the south side of the street. *Id.* at 573-75, 1006-07. Britt and Moore crossed Pitkin Avenue toward Lowden and Riley. *Id.* at 576, 1008. One of the females in Moore's group walked into the street, approaching Lowden and Riley, then returned to the sidewalk on the opposite side. *Id.* at 576-77. Britt and Moore then approached Lowden and Riley's group. *Id.* at 1008.

Moore held his hand behind his back and said "something like yo." *Id.* at 578. Moore "asked the guy if he was chowing" -- meaning whether Riley was a Hoodstarz member. *Id.* at 1009. Riley looked at Lowden, seemingly startled, and Moore pulled out a gun and shot Riley four or five times. *Id.* at 581. Lowden did not see the gun, but when Moore started shooting, Lowden ran. *Id.* Britt saw Riley "just drop" and ran home. *Id.* at 1041, 1044. The rest of Moore's group ran as well. *Id.* at 584.

4

Lowden returned after the shots stopped; Riley was lying on the ground and could not communicate. *Id.* at 582. Riley's uncle, Patrick Scully, also arrived at the scene after Riley was shot and found that Riley was dead. *Id.* at 563-64.

Police Officer Joseph Unterkofler responded to the scene a little after 3:45 a.m., secured the area, and called for EMS. *Id.* at 1046-47. Detective Christopher Florio, of the Crime Scene Unit, responded to the scene at approximately 6:30 a.m. *Id.* at 651. There were seven nine-millimeter shell casings and a baseball cap on the ground near Riley's body, which was photographed and recovered. *Id.* at 653.

Steven Francis, the manager of the McDonald's on Pitkin Avenue, subsequently provided Detective Edward Morales with a copy of surveillance footage which showed the individuals at that location between 2:00 a.m. and 4:00 a.m. on July 23, 2011. *Id.* at 642. Detectives also interviewed Lowden and Britt after the shooting. *Id.* at 583, 1028.

An autopsy revealed that Riley had suffered five gunshot wounds, including fatal shots to the torso. *Id.* at 710-14.

### 3. *The July 2011 Robbery*

In mid-to-late July 2011, La'Asia Swift -- who had formerly been affiliated with Hoodstarz members but was a member of the "FF" gang, *id.* at 831 -- was riding the L train when a male who identified himself to her as "Bam" approached her. *Id.* at 900-01. He grabbed her, stood over her, and told her that "they was gonna beat [her] up,"

5

but let her go because they were on a train.  *Id.* at 827.

Around a week later, around July 27, 2011, Swift was in Downtown Brooklyn for jury duty.  *Id.* at 824-25.  During the lunch break, she went to the Sprint store at 400 Jay Street to buy a new phone and spoke with Sprint employee Kimberly Carmona.  *Id.* at 825.  Swift then stepped outside to talk on the phone.  *Id.*  As Swift was outside the Sprint store, a group of five to eight males approached her.  *Id.* at 826.  The group included Moore; Bam, whom Swift recognized from their previous encounter on the L train; Jason Flournoy, known as "Butta"; Lawan Dawes, known as "Fresh"; and Nigel Wilcher.  *Id.* at 839-40; Dkt. 5 at 20.  Bam told Swift that he had "[c]aught [her] slippin[g] again," which Swift understood to mean that he had "caught [her] at the wrong place and the wrong time."  Dkt. 6 at 827, 852.  Swift had seen some of the others on the street, and recognized some, including Moore, from Facebook, Myspace, and YouTube videos, where they had "scream[ed] Wave Gang" and flashed the Wave Gang sign.  *Id.* at 828-29.

Swift backed up to the doorway of the store and put her phone in her pocket.  *Id.* at 830.  The males, including Moore, surrounded Swift, blocking her from leaving, and asked if she was Brower -- another gang located in Crown Heights -- or Hoodstarz.  *Id.* at 831.  The males taunted her with their call, "Woo."  *Id.* at 831-32.  They yelled for Swift to come out of the store, and that they wanted to take her phone; she walked to the doorway but did not leave the store.  *Id.* at 1057.  Carmona watched from

6

behind a counter in the store because the interaction, which had first seemed like "friends playing around," now "began to look like enemies." *Id.* at 1058.  Butta put Swift in a headlock, dragged her out of the store, and said "F Brower, F Hoodstarz." *Id.* at 832. Swift was frightened.  Moore, who was directly in front of Swift, blocking her path, began recording Swift with his Blackberry.  *Id.* at 835.

Before he began recording, Moore was "just as involved as everyone else, getting her to the front of the store, yelling at her, checking her pockets." *Id.* at 1066. Swift told the males that she was "FF" because she was no longer associating with Hoodstarz or Brower.  *Id.* at 831.  As Moore recorded, his associates laughed, joked, and made the Wave Gang sign.  *Id.* at 1060-61.  Butta asked Swift if she was Brower and smacked her in the face, knocking off her glasses.  *Id.*  Carmona walked toward the front of the store to tell the group to leave and that the police were being called.  *Id.* at 1061. Moore stopped recording, and his cohorts began going through Swift's pockets, "tussling" with her and lifting her into the air, until one male found her phone and took it.  *Id.* at 908.  Swift asked for her phone back, and Carmona told them to return it, but they ran toward the train station.  *Id.* at 908, 1061.

Carmona and other Sprint employees ran after the fleeing group.  *Id.* at 1062.  Swift followed.  Police officers, including Michael Figueroa and Omar Santiago, responded to the scene.  *Id.* at 1142.  The police spoke with Carmona and Swift, apprehended three of the males -- Butta, Fresh, and Wilcher -- in the train station, and

apprehended Moore on the street. *Id.* at 1139. All four were arrested and brought to the 84th Precinct. Swift's phone was never recovered. Figueroa recovered Moore's cell phone and obtained a search warrant for it. *Id.* at 1140.

Detective Robert DiBattista analyzed the phone's MicroSD card. *Id.* at 930. He extracted files, including the video Moore had recorded of Swift surrounded by the group of males, a music file labeled "WAVEGANG5611," and a music file labeled "ty62611tr1," a copy of which was admitted in evidence. *Id.* at 929-30. A song labeled "ty62611tr1" referenced the Wave Gang, referred to .38 caliber firearms, used the term "sprayy'all" -- meaning to shoot -- and referred to shooting "stars" out of the sky, which was code for the Hoodstarz. *Id.* at 1318-19.

## B.  *Procedural History*

### 1.    *State Court Proceedings*

#### a.    *The Indictments*

For the attempted murder of Billy Pitt and the assault of Deborah Crowder, Moore was charged with second-degree attempted murder, first-degree attempted assault, second-degree attempted assault, two counts of second-degree criminal possession of a weapon, second-degree reckless endangerment, and fourth-degree criminal possession of a weapon. Dkt. 5 at 2. For the murder of Marlon Riley, Moore was charged with first-degree conspiracy, second-degree conspiracy, three counts of third-degree conspiracy, three counts of fourth-degree conspiracy, second-

degree murder, two counts of second-degree criminal possession of a weapon, and second-degree assault. *Id.* at 3. For the robbery of La'Asia Swift, Moore was charged with second-degree robbery, third-degree robbery, fourth-degree grand larceny, and petit larceny. *Id.*

Others in the Wave Gang, including Sahiah Davis, were charged for crimes related to Wave Gang activities that occurred during the 2010-2011 timeframe (some overlapping with those mentioned above, and others not), and a number of these indictments were consolidated. *Id.* Only Davis, however, was tried alongside Moore.

### b.    *The Trial Court Proceedings*

Trial began on November 13, 2013. Dkt. 6 at 164. As to the November 2010 shooting of Deborah Crowder, the jury heard testimony from Crowder, *id.* at 468-85, Officer Foglia, *id.* at 492-508, Detectives Centeno and Valente, *id.* at 517-57, 744-69, 797-816, 1263-80, and Billy Pitt, *id.* at 945-83. As to the July 2011 murder of Marlon Riley, the jury heard from Michael Lowden, *id.* at 569-636, Devon Britt, *id.* at 988-1045, Patrick Scully, *id.* at 559-69, Detective Florio, *id.* at 649-84, Officer Unterkofler, *id.* at 1045-53, and Steven Francis, the manager of the McDonalds, *id.* at 640-45. Dr. McCubbin, an expert in the field of forensic pathology, also testified as to the results of Riley's autopsy. *Id.* at 685-744. Finally, as to the July 2011 robbery of La'Asia Swift, Swift testified, *id.* at 818-915, as well as Kimberly Carmona, the Sprint employee who witnessed the robbery, *id.* at 1054-72, Sergeant Figueroa, *id.* at 1136-50, and Detective

9

DiBattista, *id.* at 926-34.  Detective Desposito, a detective familiar with the gangs in

Brownsville, also testified as to the meaning behind the lyrics in the song "ty62611tr1."

*Id.* at 1284-1345.  Neither Moore nor Davis testified, and the defense did not present any

witnesses.  *Id.* at 1360-61.

   The court submitted to the jury separate counts for Moore and Davis -- for

Moore, second-degree murder, second-degree criminal possession of a weapon, second-

degree attempted murder, first-degree attempted assault, second-degree assault, and

robbery.  *Id.* at 1479-88.  The court chose not to charge the jury with conspiracy "to avoid

juror confusion and redundancy of charges since the elements of the murder case and

the robberies relate to the conspiracy."  *Id.* at 1373.

   On December 6, 2013, the jury returned a verdict finding Moore guilty of

second-degree murder, second-degree criminal possession of a weapon, second-degree

attempted murder, second-degree assault, and second-degree robbery.  *Id.* at 1567-74.[2]

   On January 15, 2014, the court sentenced Moore to twenty-five years to life

imprisonment on the murder count; five years, with five years' post-release supervision,

on the weapon-possession count; ten years, with five years' post-release supervision, on

the attempted-murder count; five years, with five years' post-release supervision, on the

assault count; and five years, with five years' post-release supervision, on the robbery

---

[2] The jury also found Davis guilty of second-degree murder and second-degree criminal possession of a weapon.  *See* Dkt. 5 at 25.

count.  The murder and weapon-possession sentences were to run concurrently to each

other, and the resulting 25-year sentence was to run consecutively with the others.  *Id.* at

1603-05.  Accordingly, Moore's sentences totaled forty-five years to life.

### c.    The Direct Appeal

On June 7, 2017, Moore, represented by counsel, appealed to the Appellate

Division, Second Department, arguing that (1) his convictions were not supported by

legally sufficient evidence and were against the weight of the evidence; (2) he was

denied a fair trial by the trial court's admission of background evidence regarding gang

membership and rivalries and by the trial court's refusal to strike that evidence after it

dismissed the conspiracy charges; (3) he was denied his right to present a defense and

to confrontation by the limits that the trial court imposed on cross-examination of

various prosecution witnesses; and (4) his sentence was excessive.  *Id.* at 1620-1705.  On

September 9, 2018, the Appellate Division affirmed Moore's convictions, holding that he

had failed to preserve his arguments pertaining to the sufficiency of the evidence, the

admission of background evidence, and the scope of cross-examination, and that in any

event, these arguments were meritless.  *Moore I*, 83 N.Y.S.3d at 684-85.  It also held that

Moore's sentences were excessive to the extent that the trial court ordered the sentences

to run consecutively, and, accordingly, "all sentences shall run concurrently with each

other."  *Id.* at 684.  Moore's sentence as so modified therefore became twenty-five years

to life.  On November 30, 2018, the New York Court of Appeals (Fahey, J.) denied

Moore's application for leave to appeal.  *Moore II*, 115 N.E.3d at 637.

### d.  The Coram Nobis Petition

On January 15, 2020, Moore petitioned the Appellate Division for a writ of

error *coram nobis*, arguing that he received ineffective assistance of appellate counsel

because appellate counsel failed to argue that his trial counsel was ineffective for not

making various arguments.  Dkt. 6 at 1839-80.  On December 30, 2020, the Appellate

Division denied the petition, finding that Moore failed to establish that he was denied

effective assistance of appellate counsel.  *People v. Moore*, 135 N.Y.S.3d 307 (2d Dep't

2020) ("*Moore III*").  On April 18, 2021, the Court of Appeals denied leave to appeal.

*People v. Moore*, 169 N.E.3d 575 (N.Y. 2021) ("*Moore IV*").

### 2.    Proceedings in this Court

On May 24, 2021, proceeding *pro se*, Moore filed the Petition asserting that:

(1) his conviction was against the weight of the evidence; (2) the trial court denied him a

fair trial by admitting evidence of uncharged bad acts; (3) the trial court denied him his

right to present a defense and to confrontation by limiting his cross-examination of

some prosecution witnesses; (4) the sentence of forty-five years to life imposed by the

trial court was excessive; and (5) his trial and appellate counsel were ineffective.  Dkt. 1

at 5-8.

On August 10, 2021, the King's County District Attorney's Office filed its opposition to the Petition.  Dkt. 5.

On March 15, 2024, the case was reassigned to the undersigned.

## DISCUSSION

**A.**   *Federal Review of State Convictions*

A federal court may not grant a habeas petition on a claim that was adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter,* 562 U.S. 86, 97-98 (2011); *Waiters v. Lee,* 857 F.3d 466, 477 (2d Cir. 2017).  Hence, when a claim is adjudicated on the merits, the state court's decision must be accorded "substantial deference."  *Fischer v. Smith,* 780 F.3d 556, 560 (2d Cir. 2015).  "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'"  *Vega v. Walsh,* 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting *Harrington,* 562 U.S. at 103); *see also Wetzel v. Lambert,* 565 U.S. 520, 524 (2012) (per curiam).

Moreover, "federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Cone v. Bell,* 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991)).  A state law error is therefore insufficient for habeas corpus relief unless it rises to a level that implicates a federal constitutional right.  *Wainwright v. Goode,* 464 U.S. 78, 86 (1983) (per curiam).  Such error does not rise to the level of a constitutional violation unless the petitioner can demonstrate that the error had a "substantial and injurious effect or influence" on the jury's verdict.  *Headley v. Tilghman,* 53 F.3d 472, 474 (2d Cir. 1995) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)).

Finally, a federal court may not grant the habeas petition of a state prisoner "unless it appears that the applicant has exhausted the remedies available in the courts of the State; or that there is either an absence of available State corrective process; or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner."  28 U.S.C. § 2254(b)(1).  To satisfy § 2254's exhaustion requirement, a petitioner must present the substance of "the same federal constitutional claim[s] that he now urges upon the federal courts to the highest court in the pertinent state." *Aparicio v. Artuz,* 269 F.3d 78, 89–90 (2d Cir. 2001) (internal citations and quotation marks omitted).

14

If a state court's decision regarding a claim "rests on a state law ground that is independent of the federal question and adequate to support the judgment," the claim is procedurally barred, whether the state-law ground is substantive or procedural. *Coleman,* 501 U.S. at 729; *accord Bierenbaum v. Graham,* 607 F.3d 36, 47 (2d Cir. 2010). "When the petitioner fail[s] to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, federal habeas courts also must deem the claims procedurally defaulted." *Aparicio,* 269 F.3d at 90. If a claim is procedurally barred pursuant to an independent and adequate state rule, a federal habeas court may not review it on the merits, unless the petitioner demonstrates (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750.

B.    *Analysis*

I address Moore's claims in the Petition: (1) the jury verdict was against the weight of the evidence; (2) the trial court denied him a fair trial by admitting evidence of uncharged bad acts; (3) the trial court denied him his right to present a defense and to confrontation by limiting his cross-examination of some prosecution witnesses; (4) his sentence was excessive; and (5) his trial and appellate counsel were

ineffective.  Dkt. 1.  I address the first three claims together and the last two claims in turn.

### 1.    *The Unpreserved Claims*

The Appellate Division held that Moore's first three claims -- the sufficiency of the evidence, the trial court's evidentiary rulings, and his right to present a defense and confront witnesses -- were unpreserved.  *Moore I,* 83 N.Y.S.3d at 684-85.

Habeas relief is thus not available to Moore for these claims.  For an independent and adequate state ground to bar habeas relief, the state court rendering the judgment must "clearly and expressly state that its judgment rests upon a state procedural bar."  *Whitley v. Ercole,* 642 F.3d 278, 286 (2d Cir. 2011) (quoting *Glenn v. Bartlett,* 98 F.3d 721, 724 (2d Cir. 1996)).  Here, the Appellate Division clearly and expressly stated that each of these claims was procedurally barred.

Moreover, Moore has failed to demonstrate that he is entitled to an exception to the procedural default rule, because he has not shown either (1) cause and actual prejudice or (2) that a fundamental miscarriage of justice would occur if the merits of the federal claims were not considered.  *See Edwards v. Carpenter,* 529 U.S. 446, 451 (2000) (citations omitted); *Coleman,* 501 U.S. at 748; *Carvajal v. Artus,* 633 F.3d 95, 104 (2d Cir. 2011).

Finally, even if these claims were not procedurally barred, they still fail on the merits.  Indeed, the Appellate Division considered each of these claims and found

that they were without merit. *See Moore I,* 83 N.Y.S.3d at 684-85. This determination is entitled to "substantial deference," *Fischer,* 780 F.3d at 560, and will not be overturned by a federal court conducting habeas review unless the petitioner can establish that the state court's conclusion was "unreasonable," *see* 28 U.S.C. § 2254(d). As explained below, Moore has not done so here.

### A.    *Sufficiency of the Evidence*

First, Moore has not demonstrated that the verdict was against the weight of the evidence. In rejecting this claim on the merits, the Appellate Division held that the evidence "was legally sufficient to establish the defendant's guilt on each of the convictions beyond a reasonable doubt." *Moore I,* 83 N.Y.S.3d at 684. Moore argues that certain witnesses were "less than reliable," and accordingly, their testimony was insufficient to support the guilty verdict. Dkt. 1 at 6. But "[a]ssessments of witness credibility and choices between competing inferences lie solely within the province of the jury." *United States v. Payne,* 591 F.3d 46, 60 (2d Cir. 2010). The jury heard lengthy testimony from several witnesses and determined that Moore was guilty. The jury's verdict is entitled to deference. *Raedle v. Credit Agricole Indosuez,* 670 F.3d 411, 418 (2d Cir. 2012) ("[W]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." (citation omitted)). Indeed, multiple witnesses testified as to Moore's actions -- Pitt and Crowder testified at length about the first

shooting incident, Lowden and Britt gave significant testimony about Riley's murder, and La'Asia Swift and Kimberly Carmona gave detailed accounts of the robbery at the Sprint store.  Moreover, the testimony of each of these witnesses was corroborated by the law enforcement officials who responded to the incidents.  This was more than sufficient evidence to prove Moore's guilt.

Accordingly, Moore's first claim fails.

### B.   *Evidence of Uncharged Acts*

For his second claim, Moore contends the People were improperly allowed to present evidence of uncharged bad acts -- specifically, evidence regarding the Wave Gang and the gang rivalries that motivated Moore's crimes -- at his trial.  Dkt. 1 at 2.  The Appellate Division held that this claim was meritless, finding that "[s]uch evidence constituted background on the gangs' purpose and was probative of motive, and the probative value of the evidence outweighed the risk of prejudice to the defendant."  *Moore I*, 83 N.Y.S.3d at 684 (citations omitted).

As a threshold matter, evidentiary rulings are generally not cognizable on habeas review.  *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) ("Erroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus.").  In any event, the evidence here was properly admitted.  "Evidence of prior bad acts is admissible to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal

18

relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *United States v. Rosemond*, 958 F.3d 111, 125 (2d Cir. 2020) (internal quotation marks and citation omitted).  Further, "[t]he probative value of prior bad-act evidence is not substantially outweighed by the risk of prejudice if the conduct is not any more sensational or disturbing than the charged crime." *Id.* (internal quotation marks and citation omitted).  Here, evidence of Moore's gang and its violent activity against the "Hoodstarz" gang was introduced to provide background about the crimes for which Moore was accused.  And mere discussion of a rivalry between gangs is certainly not more sensational than Moore's assault, murder, and robbery charges.  *See United States v. Smothers*, 652 F. Supp. 3d 271, 287 (E.D.N.Y. 2023) (allowing evidence about the historical development of a subgroup of the "Bloods" gang in a case regarding specific drug trafficking acts committed by the subgroup because "the proffered evidence . . . [was] no more sensational, disturbing, or inflammatory than th[e] charged crimes" (citations omitted)).

Accordingly, this claim fails on the merits.

### C.    The Confrontation Claim

Third, Moore argues that he should have been allowed to cross-examine various prosecution witnesses regarding elements of the police investigation and the use of excessive force alleged in an unrelated civil suit against Detective Centeno.  Dkt. 1 at 6.  The Confrontation Clause of the Sixth Amendment guarantees the right of an

accused in a criminal prosecution "to be confronted with the witnesses against him." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (citation omitted).  "[T]he main and essential purpose of confrontation is to *secure for the opponent the opportunity of cross-examination.*" *Id.* (internal quotation marks and citation omitted).  But "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination." *Id.* at 679.  Indeed, "the judge necessarily has discretion to control the form and scope of cross-examination." *United States v. Quattrone*, 441 F.3d 153, 183 (2d Cir. 2006) (citation omitted).

First, Moore argues that he should have been able to cross-examine Officer Centeno about an alibi that Moore supposedly gave him -- that is, Moore was at home asleep during the November 2010 shooting of Deborah Crowder.  Dkt. 1 at 6, Dkt 6 at 1698-99.  But the court properly found that such a statement would constitute impermissible hearsay because it was not "an admission against penal interest or any other of the recognized exceptions."  *See* Dkt. 6 at 1278 (explaining that "a statement of a defendant" is not an "exception to the hearsay rule"); *People v. Brensic*, 509 N.E.2d 1226, 1228 (N.Y. 1987) (explaining that "[o]ut-of-court statements introduced to prove the truth of the matters they assert are hearsay" unless they "fall within one of the recognized exceptions to the hearsay rule," and "the proponent demonstrates that the evidence is reliable" (citation omitted)).  In any event, discussion of such a statement, without evidence to support it, would have misled the jury as to Moore's involvement

20

in the shooting.  *See People v. Delgado*, 200 N.Y.S.3d 414, 418 (2d Dep't 2023) ("the court did not improvidently exercise its discretion in limiting the defendant's cross-examination of the prosecution witness with regard to the two hearsay statements, as the probative force of the proposed evidence was outweighed by the dangers of speculation, confusion, and prejudice" (collecting cases)).

Second, Moore's argument that he should have been able to cross-examine Detective Centeno about the facts of an unrelated civil suit lacks merit.  As a threshold matter, the court allowed Moore's counsel to ask whether Centeno had been sued for police misconduct and whether the case settled.  Dkt 6 at 544-45.  The underlying facts of the case -- whether Detective Centeno used excessive force -- were irrelevant here. Accordingly, the trial judge acted within its discretion when it disallowed cross-examination on this issue.  *See United States v. Scopo*, 861 F.2d 339, 345 (2d Cir. 1988) ("[W]e must bear in mind that the trial judge has wide discretion to exclude proffered evidence that is collateral, rather than material, to the issues in the case." (citation omitted)).  This claim therefore fails.

2.    *The Excessiveness of Moore's Sentence*

For his fourth claim, Moore argues that the sentence of forty-five years to life imposed by the trial court was excessive.  Dkt. 1 at 6.  The Appellate Division, however, modified the sentence so that it is effectively twenty-five years to life.  *Moore I*, 83 N.Y.S.3d at 684.  The modified sentence is not excessive.

There is "[n]o federal constitutional issue . . . presented where . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted).  Moore was convicted of second-degree murder, which carries a maximum sentence of 25 years to life, *see* N.Y. Penal Law §§ 70.00(1)&(3), 125.25,  second-degree criminal possession of a weapon and second-degree robbery, which carry a maximum prison term of 15 years, *see* N.Y. Penal Law §§ 70.00(2), 160.10, 265.03, second-degree attempted murder, which carries a maximum prison term of 25 years, *see* N.Y. Penal Law §§ 70.00(2), 70.02(1)(a), and second-degree assault, which carries a maximum prison term of seven years, §§ 70.00(2), 120.05.  *Moore I*, 83 N.Y.S.3d at 684.  Moore's actions included not one, but two shootings -- one resulting in the loss of life, and the other resulting in severe injury -- and a robbery.  Moore's sentence, though long, was not disproportionate to his crime and, therefore, neither cruel nor unusual under the Constitution.  *See Solem v. Helm*, 463 U.S. 277, 290 (1983) ("a criminal sentence must be proportionate to the crime for which the defendant has been convicted").  Moore's fourth claim accordingly fails.

### 3.    *Ineffective Assistance of Counsel*

Finally, Moore argues that his trial attorney was ineffective for not raising various arguments, and his appellate attorney was ineffective for not raising arguments based on his trial counsel's purported ineffectiveness.  Dkt. 1 at 6-7.  Moore raised the ineffectiveness of appellate counsel in his *coram nobis* petition, and the Appellate

22

Division held that Moore "failed to establish that he was denied the effective assistance of appellate counsel." *Moore III*, 135 N.Y.S.3d at 307 (citations omitted). This determination is entitled to "substantial deference," *Fischer*, 780 F.3d at 560, and will not be overturned by a federal court conducting habeas review unless the petitioner can establish that the state court's conclusion was "unreasonable," *see* 28 U.S.C. § 2254(d). Further, Moore failed to raise the ineffectiveness of trial counsel on direct appeal and raised it only indirectly through the ineffectiveness of appellate counsel argument in his *coram nobis* petition. Accordingly, it is unclear whether this claim is exhausted. In any event, as discussed below, both claims fail on the merits.

In general, to prevail on a claim of ineffective assistance under federal law, a petitioner must (1) show that counsel's performance was so deficient as to fall below "an objective standard of reasonableness" and (2) establish prejudice by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). In the context of a habeas petition under 28 U.S.C. § 2254, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' . . . and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted). Therefore, "[t]he operative question" when a federal court reviews a state court's ineffective assistance of counsel ruling is "not whether [the] federal court

believes the state court's determination was incorrect, but rather whether that

determination was objectively unreasonable." *Waiters*, 857 F.3d at 478 (alterations

adopted) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

   The standard to establish an ineffective-assistance-of-counsel claim under

New York law is lower than under federal law. *See People v. Honghirun*, 78 N.E.3d 804,

807 (N.Y. 2017). In New York, a defendant must show only "that counsel failed to

provide meaningful representation." *People v. Alvarez*, 125 N.E.3d 117, 120 (N.Y. 2019)

(citing *People v. Stultz*, 810 N.E.2d 883 (N.Y. 2004); *People v. Baldi*, 429 N.E.2d 400 (N.Y.

1981)). Unlike the federal standard, *see Strickland*, 466 U.S. at 694, under the state

standard, the defendant is not required to demonstrate that he was prejudiced by the

ineffective assistance. *See Alvarez*, 125 N.E.3d at 120.

   Moore argues that trial counsel should have objected to the consolidation

of the conspiracy counts with the murder, attempted murder, assault, and robbery

counts at trial, Dkt. 1 at 6-7, because the evidence of gang rivalries discussed *supra*

Section 1.B. related only to conspiracy, and conspiracy was never charged to the jury.

But Moore's trial counsel *did* argue that that evidence should be stricken, and the court

rejected the argument. Dkt. 6 at 1371-72. The court noted that the evidence did not just

relate to conspiracy; rather, it related to all the charges to establish motive because "one

couldn't understand the charges in this case without understanding the background

and the motive and why they are committed." *Id.* at 1373. And to the extent Moore is

arguing that this evidentiary ruling was erroneous, that is a state law issue generally

not cognizable on habeas review. *Taylor*, 708 F.2d 891 (2d Cir. 1983). This argument

therefore fails.

Moore also argues that trial counsel should have contested the joinder of

his case with that of codefendant Davis. As a preliminary matter, "[i]n all cases a strong

public policy favors joinder, because it expedites the judicial process, reduces court

congestion, and avoids the necessity of recalling witnesses." *People v. Dean*, 767

N.Y.S.2d 114, 116 (2d Dep't 2003) (citation omitted). Moore argues that he was

prejudiced by the joinder of Davis's case with his own because if the cases had not been

consolidated, Davis would have testified that Moore did not kill Marlon Riley. Moore

has not pointed to any evidence in the record that suggests his assertion is true.

Accordingly, this argument fails.

Finally, Moore argues that his trial attorney failed to prepare a defense.

But this claim is plainly meritless and contradicted by the record. Indeed, as

Respondent notes, "counsel mounted a skillful, albeit unsuccessful, attack on the

People's case. His tactics included cross-examining a detective regarding a prior

lawsuit . . . and introducing surveillance video, which he played back and narrated on

summation." Dkt. 5 at 52. This claim therefore fails.

Accordingly, Moore's arguments that his trial counsel was ineffective lack

merit. For that reason, Moore's argument that his appellate counsel was ineffective for

not raising the ineffectiveness of trial counsel on appeal is also meritless. *See Aparicio v. Artuz*, 269 F.3d 78, 100 (2d Cir. 2001) ("counsel was not ineffective for failing to raise . . . meritless argument." (citation omitted)).  Accordingly, Moore's ineffective assistance claims fail.

*CONCLUSION*

Moore has failed to show a basis for relief under 28 U.S.C. § 2254. Accordingly, the Petition is denied.  Additionally, I decline to issue a certificate of appealability because Moore has not made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253.

The Clerk of the Court shall enter judgment accordingly and close this case.  The Clerk of Court shall also mail copies of this memorandum decision and the judgment to Moore at the address set forth above.

SO ORDERED.

Dated:      New York, New York
            April 19, 2024

                                        DENNY CHIN
                                        United States Circuit Judge
                                        Sitting By Designation